Gerald E. FINK, Appellee,

v.

WESTERN ELECTRIC COMPANY,
Appellant.

Gerald E. FINK, Appellant,

v.

WESTERN ELECTRIC COMPANY,
Appellee.

Nos. 82–1214, 82–1272.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 6, 1982.

Decided May 19, 1983.

George R. Hodges, Charlotte, N.C. (Moore & Van Allen, Charlotte, N.C., Robert W.

Benson, Greensboro, N.C., on brief), for appellant in 82–1214, and for appellee in 82–1272.

David C. Pishko, Winston-Salem, N.C. (Pfefferkorn & Cooley, P.A., William G. Pfefferkorn, Winston-Salem, N.C., on brief), for appellee in 82–1214 and for appellant in 82–1272.

Before RUSSELL, WIDENER and SPROUSE, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

The plaintiff in this action seeks recovery of damages for alleged age discrimination on the part of the defendant under the Age Discrimination in Employment Act of 1967 (ADEA). 29 U.S.C. § 621, et seq. After discovery, the cause came on for jury trial. Both at the conclusion of plaintiff's evidence and at the close of all the evidence, the defendant moved for a directed verdict on the ground of insufficiency of the evidence. The motions were denied. After submission of the cause, with appropriate interrogatories, the jury returned its verdict, finding that the defendant had violated the Act in discharging the plaintiff and that such violation was wilful. It awarded plaintiff actual damages in the amount of $64,139. Judgment for actual damages was entered in accordance with the jury's verdict and the district court fixed the award of liquidated damages under the Act as "nothing." [1]

The defendant thereafter filed a timely motion for judgment notwithstanding the jury's verdict and the plaintiff moved at the same time to amend the judgment to provide for an award of liquidated damages and for reinstatement of the plaintiff, with restoration of pension benefits. The district court denied both motions. It reserved for later determination a motion of the plaintiff for an allowance of attorneys' fees but provided in connection with the request for liquidated damages that, if on appeal it should be held that the district court was without discretion to fix liquidated damages at "nothing," a new trial on the issue of wilfulness would be granted. Both parties have appealed. We reverse, holding that the motions of the defendant for a directed verdict should have been granted. Such decision makes unnecessary consideration of plaintiff's appeal.

I

The defendant in this action, a corporate subsidiary of the American Telephone and Telegraph Company (AT & T), is engaged in research and manufacturing, primarily in the electronic or telephone field. Sometime prior to 1967 it had undertaken under a contract with the Department of Defense to design a defensive anti-ballistic missile system. The Department determined in 1967 to construct and deploy such system and the defendant was selected by the Department as the primary contractor for what was referred to as the Safeguard Anti-Ballistic Missile System (ABM). After being awarded the contract, the defendant entered into a number of substantial subcontracts with, among others, General Electric Company, Raytheon and Martin-Marietta. The subcontract with Martin-Marietta, with which this proceeding is concerned, contemplated the construction of that part of the system known as the Sprint missile at its plant in Orlando, Florida. While the actual construction of the Sprint Missile was committed under the subcontract to Martin-Marietta, the defendant as the primary contractor had the responsibility of following both technically and administratively Martin-Marietta's performance under the subcontract. To perform this function the defendant assigned administrative and engineering personnel to the Martin-Marietta plant. This personnel, housed in the facilities of Martin-Marietta, operated under the overall supervision of the defendant's Project's headquarters at Guilford Center in Greens-

---

1. For a discussion of "wilful" under the Act, see Note, The Meaning of "Wilful" Under the

*Liquidated Damage Provision of the Age Dis-*

boro, North Carolina.[2] One of its senior engineers assigned to the Martin-Marietta project by the defendant in 1967 was the plaintiff.

While work under the Project progressed, negotiations were begun between Soviet Russia and the United States for arms limitations. The employees on the Safeguard Project, including those in Orlando, knew of these negotiations and it is freely conceded that they recognized that the continuance of the Project and consequently their continued employment would be affected by the results of such negotiations. As one of plaintiff's fellow employees and witnesses put it, "we [referring to himself and the other employees on the project] were aware of the ramifications of [the negotiations]" and knew that, if a treaty were signed, it "meant the end of the Safeguard program because that was part of the negotiations on SALT I." In late 1972, SALT I was signed. With that news, the employees involved with the Safeguard program understood without being expressly told by the defendant that, as one of plaintiff's co-workers-witnesses testified they "had to find a new home, a new job" and "[p]lacement was on the minds of everyone [at the Project] at that time."

Before the end of 1972, as the employees on the project apprehended, the contract for Safeguard was cancelled by the Government and the defendant was ordered expeditiously to phase out the work. One of the difficult problems caused by the cancellation was the need to terminate all the employees on the project. The defendant immediately began to formulate plans to provide assistance to the Safeguard employees in securing other jobs, if possible, with other Bell companies. To perform this function it created two Groups or Committees and assigned to each adequate personnel to perform their respective functions.

One of these Groups was known as the Engineering Personnel Relations Group (ERP Group). This ERP Group had responsibility for two specific tasks. First, it was required to visit the various facilities in all the Bell companies. The purpose of such visits was to acquaint the responsible personnel officers in those other Bell companies with the availability of the Safeguard employees for consideration for any future job vacancies which such companies might have and to promote consideration of such employees for vacancies that might develop. The Group also arranged, in connection with such visits, to receive from these companies prompt notification of any vacancies that might be expected in their organizations, with description of the qualifications required in filling such vacancies as well as information on the salary range for the job. As notifications of such impending vacancies were received from these other companies, the Group was charged with the duty of providing lists (known as JBIs) of these vacancies, with appropriate identifications of the duties, title, required qualifications and pay levels of the job vacancies to be filled. These JBIs were to be distributed to each Safeguard facility and one of the Safeguard employees at each such facility or operation was designated to "keep this job book up-to-date, to file the new [job vacancies], and to remove those that had been filled." At the Martin-Marietta plant, the employee to whom this responsibility was later committed was the plaintiff's witness, Conilogue.[3] The purpose of securing this information and incorporating it in listings made available at each facility having Safeguard employees was, as explained by the head of the Group, "[t]o make every technical supervisor and employee within the Safeguard Program aware of every single possible job opening that we could locate anywhere in the Bell System."

---

*crimination in Employment Act,* 68 Iowa L.Rev. 306 (1983).

**2.** The defendant had no facility of its own in Orlando.

**3.** In addition, the plaintiff's friend, Carl Rick, had charge of the distribution of the lists, and

of the identification of job vacancies from the Guilford Center and he "kept [the plaintiff] informed" of any impending vacancies in which it would appear the plaintiff would have an interest, "whether it was on a JBI or some other way."

At the same time that it was setting up this procedure for identifying, and for making available information relating to all impending job vacancies in the Bell System, the Group was expected to take steps to acquaint the employees of the procedure to be followed by Safeguard employees in applying for these vacancies and to invite their use of such procedures.

The other Group created by the defendant, known as the Technical Employee Placement Committee (TEPC), had the responsibility of reviewing the record of every employee about three months before the date finally fixed for his actual termination under the planned phasing-out of the operation in order to determine whether, on the basis of his employment record, particularly his length of service and performance rating, there was within the defendant's own defense operations any other job for which the employee was qualified and to which he would be entitled to "bump" an incumbent employee under the defendant's employee procedures. In carrying out this task, the Committee sought to classify all the employees to be terminated in four categories, classified in relation to length of service and job performance. Those found in the classifications to be but "marginal" in performance were treated as terminable in accordance with the established schedule for employee terminations in the phasing-out of the project. The others were considered on the basis of their standing in their respective classification, both on the basis of length of service and on job performance ratings.

## II

As soon as the EPR Group was constituted, it arranged to bring to the attention of all Safeguard employees the functions of the Group and to invite their cooperation and assistance. In line with this plan, Chesson, who was the Engineering Personnel Relations department chief on the Safeguard project, visited the Martin-Marietta

facility "in the fall of 1972, probably October, November time frame" and interviewed all the Safeguard employees at that facility. He alerted these employees not only to the purposes of the Group but he also discussed with each employee the latter's own employment resume, qualifications and job preferences or interests. He explained to them the procedure that had been formulated by the defendant to enable them to identify through the use of the JBI lists impending job vacancies in the Bell System in which any of them might be interested and for which they might apply. He counseled them to follow closely the JBIs and "if [they] saw one that came through that [they] made a match with [their] qualifications as [they] saw it and a location which [they] would desire," then to advise the Group so that it might submit an application on their behalf. The plaintiff was one of those Chesson specifically interviewed and counseled with on this occasion.

## III

The plaintiff at the time of his interview with Chesson in 1972 had been employed on the Safeguard project at Orlando since 1967 and during such time he had been promoted to the classification of senior engineer.[4] There were special circumstances which made it important to the plaintiff that he remain in Orlando and these he explained to Chesson. He had traveled a great deal since his employment in 1960. He and his wife wished to settle in Orlando. He had just completed a house in Orlando which he intended to be his permanent home. In addition, he had acquired another house, adjacent to his own home, which he had fixed up as a home for his wife's mother and father. Both the mother and father were advanced in years and not in good health, requiring someone available "to look after them." Their condition made it, as the plaintiff made clear, "almost a necessity in order to help my wife [with her mother and father] that [he] remain in Orlando."

**4.** He had originally been employed by the defendant for a period of two years in the middle fifties but he had quit and was only re-em-

ployed in 1960. He had been assigned to the Safeguard Project in 1967.

While he did not tell Chesson in this interview that he would not consider a job somewhere else, the plaintiff did request Chesson that, because of his personal situation as he had set it forth to Chesson, his employment at Orlando be continued during the phasing-out process as long as possible. He restated this request in a discussion with his immediate supervisor, and, at his supervisor's suggestion, incorporated his request in a formal letter to be included in his employment file.

Though he had been advised that his job in Orlando would be phased out, the plaintiff made, by his own admission, no effort toward securing another job during 1973 and his activity in that regard during 1974 does not appear to have been enterprising. He rationalized his lack of interest with the observation that "someone had to mind the store and I felt that I was just as qualified to mind the store until the store closed as anybody else, and, therefore, in the beginning I just wasn't concerned because I knew the job was going to go on until three or four years more." It is intimated by the plaintiff that he may, also, have been encouraged in his dilatoriness by Chesson's remark, made in the interview in late 1972 after reviewing with the plaintiff his qualifications and employment record, that "indicated ... that [he] saw no reason that there would be any problem at any time for finding [the plaintiff] a job." Moreover, there appeared in 1972 and 1973 to be a reasonable number of job openings and interested employees were generally securing jobs. The plaintiff himself testified that a number of employees who, like himself, wished to remain in Florida, were quite active in these early years after notice of cancellation of the project in availing themselves of job openings listed on the JBI lists in the Florida area, among whom was an engineer Chrissman, to whom we refer later.

Whatever the reason, the plaintiff was plainly not active in seeking a new job for quite some time after being told the project had been cancelled and all employees would be terminated, and at a time when many other employees, who, unlike the plaintiff, were availing themselves of the job vacancies shown on the JBI's and were securing jobs with other Bell companies. In fact, it was not until late December 1973 or early 1974 that the plaintiff made any request at all that his name be submitted for a job opening. This opening was at a proposed facility in South Carolina. That project, however, was cancelled and any opportunity for a job there vanished.[5] Other than this one request, the plaintiff testified to no noticed job opening in which he evidenced an interest and requested that his application be considered. According to the plaintiff, however, his supervisor, despite the plaintiff's apparent indifference, "continued to find jobs for [him]" and actually submitted his resume for some openings without plaintiff's permission. These, however, were "for jobs and locations that," as the plaintiff explained, "I (i.e., the plaintiff) didn't want to go to." One of such jobs was in New York. This was a job that Nichols, the supervisor, said he "had a fix on" and appeared confident he could obtain the job for the plaintiff. The plaintiff asked not to be submitted for the job because he didn't feel qualified and he didn't like the New York area anyway.[6] Somewhat frustrated by the plaintiff's attitude, Nichols testified (and this testimony was not disputed by the plaintiff) that he told the plaintiff:

---

5. Later the project in South Carolina was revived and the plaintiff renewed his request that his resume be submitted. However, the specific job required the qualification of a mechanical engineer and the plaintiff was not a mechanical engineer. Further, as the defendant advised the plaintiff, it had already submitted another Safeguard employee for the job and, under the agreement with other Bell companies, the defendant was not to submit multiple names for consideration for the same vacancy.

6. The plaintiff's claim of lack of qualification is based on the fact that the job's qualifications included both engineering and real estate experience. He contended he lacked real estate experience, even though he had set forth among his qualifications on his employment resume real estate experience. On the location of the job, the plaintiff expressed a disinclination for working in the New York area.

"Look, Gerry, there's going to come a time, you know, that your job is winding up in March of '75, and in fact, we could be facing a termination and that is pretty strong action."

To this warning, the plaintiff replied: "Well, I'll just take my chances." The plaintiff fixed the time of this conversation as August, 1974. Before that date, however, he testified that Chesson, who had originally "indicated," according to the plaintiff, that he didn't expect any trouble in placing plaintiff in a job, and with whom the plaintiff had, by his own characterization, "a fairly close rapport," telephoned the plaintiff and warned him "that things were pretty tough and it was getting harder and harder to place people, and that [he] had better make more and more effort." The record, however, indicates that, despite these warnings, the plaintiff made no request that his resume be submitted for any job opening with a Bell Company between April and December, 1974.

By 1975, defendant's engineers at Orlando had been reduced to four, two of whom were slated for voluntary retirement. Only two, the plaintiff and Conilogue, were available for placement and there was a continued need at the facility for but one engineer, whose job would be to handle the final closing of the facility, slated for some time in 1976. Conilogue, who was senior both in company service and in performance rating to the plaintiff, had been selected as the lone engineer to be retained. The plaintiff does not question this selection of Conilogue. Accordingly, the plaintiff was notified of his termination as of March 30, 1975. His name was then transferred to the TEPC, which began an effort to place the plaintiff. In the meantime, the job picture had changed markedly from what it was in 1972, 1973 and parts of 1974. The OPEC-generated recession had taken hold and curtailments in employment were current. Employment by the defendant, for instance, dropped from over 200,000 to approximately 160,000. Similar reductions, though perhaps not as drastic, were occurring in other Bell companies. In spite of this darkened employment picture, the Group did locate a job for the plaintiff in Madison, New Jersey, to begin April 1, 1975. The plaintiff asked that his reporting date be extended and it was extended to June 30. However, before the plaintiff's final date for reporting arrived, this job was abolished because of another contract cancellation. In the meantime, though, the plaintiff's employment at Orlando had been extended twice, once from March 30 to June 30, and finally, from June 30 to September 30. Under the defendant's regulations no further extension was possible and the plaintiff's employment was terminated on September 30, 1975. The plaintiff thereafter filed this suit.

IV

The first issue is the identification of the appropriate legal standard for assessing the sufficiency of evidence required for jury resolution of plaintiff's ADEA claim. The plaintiff suggests that *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230 (4th Cir.1982), provides the model for resolving such issue. That case involved a job demotion. In determining whether the plaintiff had met the requirements of proof sufficient to require jury submission of a violation of the Act on account of such demotion, the Court began by declaring "the substantive elements" of an action under the Act "without regard to attempted modes of proof." Such elements were: "(a) that an employee [is] covered by the Act (b) has suffered an unfavorable employment action by an employer covered by the Act (c) under circumstances in which the employee's 'age was a determining factor' in the action in the sense that 'but for' his employer's motive to discriminate against him because of his age, he would not [have suffered the action]." The Court recognized that generally, the presence of the first two requirements under this formulation is not contested in any ADEA case, leaving as "[t]he dispositive and only issue the difficult, but narrow, motivational one [central to any ADEA claim]: . . . whether 'age was a determining factor' . . . in the sense that 'but for' his employer's motive to discriminate against

him because of his age, he would not have [suffered the action]." 681 F.2d at 238–39. Accordingly, under *Lovelace* the dispositive liability issue is normally the motivational one stated by it in its third element of an ADEA action, as quoted *supra.*

There is little difference between the principles stated in *Lovelace* and those enunciated in *Williams v. General Motors Corp.,* 656 F.2d 120, *cert. denied,* 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982), a case relied on by the defendant. Such difference as exists relates to the factual pattern of the two cases. Thus, *Williams* arose in the context of a reduction-in-force occasioned by the discontinuance of one of two shifts in the defendant's plant, rather than a demotion as in *Lovelace.* The Court in *Williams* found the first two elements of an ADEA action in that case to be (1) that the plaintiff was within the protected class under the Act and (2) that "he was qualified to assume another position at the time of discharge or demotion." The important third element in such an action, however, was stated to be one "tailored to the reduction-in-force facts such as [that] before us and requires some amplification." It prefaced its statement of this third element, with this general statement of the purposes of the Act: "The ADEA mandates that an employer reach employment decisions without regard to age, but it does not place an affirmative duty upon an employer to accord special treatment to members of the protected age group." The Court then phrased this third requirement thus: "Our third requirement simply insists that a plaintiff produce some evidence that an employer has not treated age neutrally, but has instead discriminated based upon it. Specifically, the evidence must lead the factfinder reasonably to conclude either (1) that defendant consciously refused to consider retaining or relocating a plaintiff because of his age, or (2) defendant regarded age as a negative factor in such consideration." 656 F.2d at 129–30. Both cases are substantially the same on the type of evi-

dence which may be used to support or rebut a case under the Act. It is evident that there is no basic difference in the test employed in the two cases. Under both, motivation is the critical issue and only if age were "consciously" the "but for" reason for the defendant's discriminatory action can a plaintiff prevail.[7]

■ Building on the "proof scheme" enunciated in *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248 at 252–53, 101 S.Ct. 1089, at 1093, 67 L.Ed.2d 207 (1981), and adapting such scheme to the unique facts of the particular ADEA case at trial, both *Lovelace* and *Williams* have stated rules for proving a prima facie case of age discrimination, giving rise to a rebuttable factual presumption of discrimination "in the initial stage of proof." *See* 681 F.2d at 239 and 656 F.2d at 129. To some extent the requirements for such proof are more exacting in *Williams* than in *Lovelace.* This difference, which could be attributed to a difference in the type of alleged discriminatory action in the two cases is, however, unimportant in this case. The presumption or inference arising from proof of a prima facie case dissolves in the ADEA case upon evidence adduced by the defendant of a legitimate, non-discriminatory reason for its action. *Lovelace,* 681 F.2d at 239. At that point the burden shifts back to the plaintiff and "the factual inquiry proceeds to a new level of specificity (*i.e.,* whether the defendant's proffered reason is pretextual)" and merges with the plaintiff's ultimate burden of "persuading the court that she has been the victim of intentional discrimination." *Burdine,* 450 U.S. at 256–57, 101 S.Ct. at 1095. In assessing the evidence for sufficiency to compel jury submission under this burden, the court may consider all credible evidence, either "direct or indirect," offered under "ordinary principles of proof" including the evidence presented in the initial stage of proof. *Lovelace,* 681 F.2d at 240–41. Such evidence, "without resort to any special judi-

---

7. It is interesting that in *Lovelace* the judgment notwithstanding the verdict in favor of the defendant was affirmed on the ground of insufficiency of the evidence, and in *Williams* judgment in favor of the plaintiff was reversed for insufficiency of the evidence.

cially created presumptions or inferences related to the evidence," must support with "substantial" or "reasonable probability," as distinguished from "possibility" or "speculation," the inference against the defendant's specifically advanced explanation. *Cline v. Roadway Exp., Inc.,* 689 F.2d 481, 485 (4th Cir.1982); *Lovelace v. Sherwin-Williams Co., supra,* 681 F.2d at 239, 242.

## V

Before discussing plaintiff's proof adduced to meet his "motivational" burden, it is appropriate to mark out the specific discriminatory action on which the plaintiff predicates his claim. The alleged discriminatory action in this case is quite different from that in either *Lovelace* or *Williams.* In *Lovelace,* as we have seen, the action challenged involved a demotion of the plaintiff and his replacement by another employee as manager of one of defendant's stores. The *Williams* case involved the elimination of one of two shifts in one of defendant's plants, as a result of which certain of the plaintiffs were "left . . . jobless" and others were "relegated . . . to hourly wage employee status." In this case, however, the entire Safeguard program, with all its employees, were terminated. We are not concerned with a hiring decision, an employee demotion or promotion. There were no jobs or employees retained. However, all of the Safeguard employees were not terminated at the same time; there was some order of precedence followed in these terminations. The plaintiff cannot complain of any discrimination in this regard. He was retained for almost three years after the termination program was begun and actually was next to the last engineer retained. As we have already observed, the sole engineer retained longer than the defendant was one senior in service and superior in job performance to the plaintiff and one whose age was within four years of the plaintiff's age. The plaintiff did not suggest that this employee's retention was discriminatory or unjustified. What the plaintiff is complaining of is his failure to secure a job in one of the "Bell companies." It is conceded that each "Bell company" had complete control in its hiring or promotion decisions or actions. In fact, the District Judge in his jury instructions made this quite clear and the plaintiff took no exception to such instructions.[8] The most that could be charged against the defendant by the plaintiff thus is that the defendant favored younger former employees of the Safeguard program over the plaintiff in submitting employee resumes for job vacancies in other "Bell companies." That was the burden assumed by the plaintiff in this case and it is in relation to that premise on which an assessment of the evidence must focus in determining the correctness of the district court's action in denying defendant's motion for a directed verdict.

## VI

We now address the plaintiff's proof on which he rests his claim. There is admittedly no direct proof of any intent or purpose on the part of the defendant to discriminate against employees because of their age. The plaintiff relies entirely on certain circumstances which he contends are sufficient to support a finding that he failed to secure a job on account of defendant's bias due to his age. When the plaintiff was asked during his testimony to specify what action the defendant had taken which represented discrimination on account of his age, he replied that his witness Conilogue had detailed it. The testimony of Conilogue to which the plaintiff referred was that when two engineering employees' resumes, one from an older applicant and the other from a younger applicant, in which the engineering education of the younger was more recent and his salary less than the older engineer, were submitted to a possible employer it was reasonable to believe the younger engineer would receive the job.[9] Implicit in this illustration

**8.** *See* note 10.

**9.** Conilogue's testimony was:

"My opinion is that when I submitted a thirty-four year old, my high salary and his low salary and his recent education and my years

is the assumption that the defendant was submitting competing applications for the job vacancies in other Bell companies. But the defendant did not submit competing resumes. When Chesson interviewed the other Bell companies about consideration of the Safeguard's terminated employees for employment by such companies, the defendant was told, as we have already stated, that they wanted only one resume submitted for any specific vacancy. And the defendant conformed, as the plaintiff well knew because on one occasion the defendant had refused to submit plaintiff's resume for a job vacancy partially on the ground that it had already submitted another employee's resume. Moreover, the plaintiff testified that this was a proper practice. The plaintiff responds that in any event, the resume as submitted included the age of the employee and that this presumably prejudiced his opportunity to secure a job. There was some controversy over whether this was true, but we regard this as unimportant. The resume, also, showed the educational and employment record of the applicant. All of this was a necessary part of an application for employment by a professional engineer. The age of an applicant could reasonably be calculated from this information, whether the resume specified the applicant's age or not. Moreover, we are unable to find evidence of a discriminatory motive simply because the resume of an employee, as submitted by the defendant in an effort to assist the plaintiff in securing a job, revealed his age, especially since this is a standard practice followed in the submission of practically all employment applications. Should we follow any other rule, we would be compelled to require the deletions of the dates in the applicant's educational or employment records, an omission which would likely prompt suspicion about the correctness of such information. We perceive no evidence of discrimination in this line of testimony.

Another circumstance which the plaintiff argues indicates that age was the "but for" factor in frustrating his efforts to obtain

work at another Bell company is the fact that the two youngest engineers employed on the Safeguard project were placed and the two oldest (the plaintiff and Conilogue) were not. However, the plaintiff himself has refuted any inference of discrimination that might arise out of the placements of Chrissman and Denning, who were the two youngest engineers identified by the plaintiff in his characterization. These two were among those young employees who, when the notice of cancellation was received, busied themselves to secure other employment. Both followed carefully the JBI lists as they were received at the Orlando facility. When Chrissman saw a job vacancy advertised at Orlando, and Denning one at Ft. Lauderdale, both immediately sought the jobs. Notices of these job vacancies were just as available to the plaintiff as to Chrissman and Denning. Plaintiff evidenced no interest in either job; he made no request that his resume be submitted. In fact, when Chrissman got his job in 1973, the plaintiff admitted he was not even interested in another job at the time. Nor were the jobs obtained by Chrissman and Denning ones the plaintiff would have likely had an interest in. Both were outside jobs, carrying what would have been a reduction in job classification for the plaintiff as well as a reduction of about a third in pay. The plaintiff had on several occasions expressed a lack of interest in a job carrying any substantial reduction in salary. If Chrissman and Denning got jobs which the plaintiff voluntarily chose not to seek, we fail to perceive how that evidence in any way provides credible support for plaintiff's cause of action.

The truth of the matter is that during the time when there were job opportunities (*i.e.,* in the period before the first OPEC-induced recession had taken effect on employment possibilities), the plaintiff was dilatory in seeking a job. It may be the plaintiff assumed that he could be placed whenever he chose and he chose to delay it as long as he possibly could. He would no doubt justify this assumption because Chesson in 1972

of being out of school, logic tells me that the

young man would have been accepted."

"indicated" to him that he did not expect any difficulty in placing the plaintiff. That was 1972 when the employment picture had a rosy look. Nor was Chesson giving the plaintiff any guarantee of a job whenever he wanted one; he was merely expressing an opinion, "indicating" what he assumed on the basis of existing conditions. Neither Chesson nor the plaintiff had any reason at the time to anticipate the OPEC action which was later taken or its effect on the job picture. But the plaintiff was in as good a position as Chesson to recognize the deteriorating picture in employment opportunities after OPEC had taken its action in 1973. Plaintiff admitted he saw the drop in job vacancies being listed in the JBI lists; he observed, as he testified, the difficulties being experienced by others in securing jobs as the year 1974 went on. Moreover, both Chesson and Nichols sought unsuccessfully to arouse the plaintiff to the need to be more active in securing a job. He dismissed these warnings with the comment that he would "take his chances." He did and his was the responsibility for the result.

There is not the slightest evidence that the defendant gave any less assistance to the plaintiff in locating a job than to any other displaced Safeguard employee, whatever his age. The plaintiff has identified only one job vacancy for which the defendant refused to submit his resume and it fully justified its action in this one instance. The defendant not only cooperated fully and impartially with the plaintiff in submitting the plaintiff's qualifications for any job vacancy in which he expressed an interest but it also identified and brought to the plaintiff's attention a number of other jobs for which it thought the plaintiff was qualified but for which the plaintiff asked the defendant not to submit his name.

The plaintiff did offer some statistical evidence. It was, however, conceded that some of the numbers used in the calculations may well have been inaccurate. Further, many of the calculations were based on small numbers and we have often remarked on the unreliability of small numbers in making statistical evaluations. *Equal Employment Opportunity Com'n. v. Am. Nat. Bank,* 652 F.2d 1176 at 1192–93 (4th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 235, 74 L.Ed.2d 186 (1982). The statistics submitted by the plaintiff dealt both with placements within the entire Bell System and placements within just the defendant itself. But it is undisputed that the defendant had no control over and was not responsible for the employment decisions of other Bell companies. That was agreed on by the parties and it was confirmed by the unqualified ruling of the District Judge, to which neither party has taken exception.[10] All the statistics relating to Bell companies other than the defendant are irrelevant. The plaintiff offered no evidence of a vacancy in the defendant's actual operations for which he was qualified and in which he was interested that he was not considered for.

This leaves for consideration the fairness and impartiality of the defendant's assistance in securing positions in other Bell companies for Safeguard employees. The plaintiff's statistics did attempt to compare these placements by age group. In so doing the plaintiff's statistician began by establishing as the critical group among Safeguard employees that from fifty-five to sixty-four years of age. If this group is compared with engineers in the age group below fifty, however, the replacements of the older group were shown even by plaintiff's statistician to have been greater than those

---

**10.** The District Judge's instruction on this point was:

"Western Electric is a part of what is known as has been told you as the Bell System. But it is a separate corporation and a separate entity from the other members of the Bell System and it is the only member of the Bell System that has been sued in this case. As you noted, the caption of the action is '*Gerald E. Fink versus Western Electric*

*Corporation.*' Therefore, you may not hold Western Electric responsible for the acts or decisions of other members of the Bell System such as AT & T, the various telephone companies or other related companies. It may be held responsible only for the acts of its officers, employees, or other agents, performed during the course and scope of their employment with Western Electric."

of the younger group. The statistician, however, divided the employees in the forty to fifty-four group into much smaller groups and then compared these smaller groups with the fifty-five to sixty-four group. It was his conclusion that the percentage of placements dropped as the ages increased.

There are a number of difficulties with all these calculations, however. In the first place, the numbers became quite small when divided into such age groups. Moreover, the plaintiff's statistician admitted that his numbers might have identified a substantial number of Safeguard employees as having been terminated, who actually had been placed. The percentage of such mislabeled employees was in the range of twenty per cent. Again, all the calculations of the plaintiff's statistician are based on the defendant's Safeguard employment records as of August, 1975. However, by that time the phasing-out of Safeguard employees had been in progress almost three years and "over seventy-three per cent of the engineers in Safeguard had already moved out of the picture and [were] not included in this data." We find such statistical data too unreliable to supply any force to plaintiff's claim. In reaching this conclusion, we are not looking to the defendant's own statistical tables which were based on more reliable numbers than those of plaintiff's statistician. These tables of defendant's statistician show no statistical significance in either the standard variances in placements between the Safeguard engineering employees in the age group fifty-five to sixty-four and earlier age groups. In essence, the statistical evidence adds nothing substantial to plaintiff's proof.

A fair reading of the record leads to one inescapable conclusion: The plaintiff was responsible for his own failure to secure a job. When jobs were available in 1973 and 1974 during which time others such as Chrissman and Denning were culling the JBI lists for job openings and aggressively pursuing job openings with success, the plaintiff was, by his own admission, largely disinterested. Even when the defendant's representatives brought to his attention job openings they thought fitted the plaintiff's qualifications, the latter dissuaded them from submitting his name in many instances. He conceded that he thought the job at Orlando would last for four more years and he preferred, as he himself said, to "take [his] chances" after that. He was not ignorant of the deteriorating job situation in 1974 at the very time he said he would "take [his] chances." Already, Chesson, the very individual who had "indicated" to him in late 1972 that he expected no trouble in placing plaintiff, had before August, 1974, voluntarily telephoned the plaintiff to warn him of the changing job picture and to admonish him to be more active in seeking a job. Moreover, Nichols, the plaintiff's immediate supervisor, warned him against his laggard attitude in seeking a job. The plaintiff chose to gamble against repeated advice from his superiors at the defendant's facility. Simply because his gamble went awry provides no basis in fact or law for a finding that the plaintiff failed to get a job "but for" his age and, more pertinently, because of any bias or inaction on the part of the defendant. The defendant's motion for a directed verdict at the close of the evidence should have been granted.

The judgment in favor of the plaintiff is accordingly reversed and vacated and the cause is remanded to the district court with instructions to enter judgment for the defendant. It is unnecessary, in view of our ruling, to consider the plaintiff's appeal.

REVERSED and REMANDED WITH INSTRUCTIONS.