Howard TAYLOR, Appellee,

v.

The HOME INSURANCE
COMPANY, Appellant.

Howard TAYLOR, Appellant,

v.

The HOME INSURANCE
COMPANY, Appellee.

Nos. 84–1851, 84–1960.

United States Court of Appeals,
Fourth Circuit.

Argued April 4, 1985.

Decided Nov. 27, 1985.

Rehearing and Rehearing En Banc Denied
Jan. 14, 1986.

John F. Gibbons (Kelley Drye & Warren, New York City, George R. Hodges; Moore, Van Allen, Allen & Thigpen, Charlotte, N.C., on brief, for appellant/cross-appellee.

George Daly (Walter Bennett, Bennett & Lawson, Charlotte, N.C., Norman B. Smith, Smith, Patterson, Follin, Curtis, James & Harkavy, Greensboro, N.C., on brief), for appellee/cross-appellant.

Before RUSSELL and SPROUSE, Circuit Judges, and BUTZNER, Senior Circuit Judge.

BUTZNER, Senior Circuit Judge:

Home Insurance Company appeals the judgment entered in Howard Taylor's action, which is based on the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* Taylor, a Home employee, sought back and front pay, liquidated damages, and equitable relief arising from two demotions. In a pendent state claim, Taylor sought compensatory and punitive damages for intentional infliction of emotional distress. The jury found that each demotion was on account of age, that each was willful, and that Home engaged in a policy or practice of age discrimination between the first and second demotions. It awarded back pay. The district court entered judgment on the verdict, awarded liquidated damages in double the amount of the verdict, and ordered equitable relief. The court dismissed the pendent claim before the case was submitted to the jury, and Taylor assigns error to this ruling in his cross appeal.

Home challenges the sufficiency of the evidence, assigning error to the district court's denial of its motions for summary judgment, a directed verdict, judgment notwithstanding the verdict, and a new trial. It asserts that it was prejudiced by the admission of evidence of Taylor's emotional suffering. It also contends: it could not be liable for the first demotion because the claim based on this event was untimely, the back pay award was excessive, the order for equitable relief was based on clearly erroneous factual findings and errors of law, and the cumulative effect of the district court's evidentiary rulings warrants reversal. Finally, it asserts that the court erred in instructing the jury to take evidence of emotional distress into account in determining whether Home willfully violated the Act. Finding merit in Home's final assignment of error, we vacate the judgment for liquidated damages and remand for a new trial on the issue of willfulness. In all other respects, we affirm the judgment. We find no merit in Taylor's cross-appeal.

## I

### Sufficiency of the Evidence

Home contends that the evidence is insufficient to support the jury's verdict that the company discriminated against Taylor because of his age when it demoted him in 1979 and again in 1981. In *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230 (4th Cir.1982), we explained the elements and means of proof of an age discrimination claim. There is no question that both Taylor and Home were covered by the Act and that Taylor was twice demoted. These elements of the Act need not detain us. The critical issue is whether Home demoted Taylor because of his age. Taylor has the burden of proving that "but for" Home's motive to discriminate against him because of his age he would not have been demoted. *EEOC v. Western Electric Co.*, 713 F.2d 1011, 1014 (4th Cir.1983). Taylor may rely on direct or indirect evidence. Also, in the initial stages of the trial, he could rely on the judicially created presumptions adapted from Title VII cases. *See Lovelace*, 681 F.2d at 238–241. The evidence was in sharp conflict. Its resolution required the jury to assess the credibility of witnesses and to draw reasonable inferences from the facts.

Taylor managed Home's Charlotte, North Carolina, regional office for nine years until his demotion in March, 1979, at age 53. Taylor's evidence showed him to be a capable and successful manager. For the two years prior to his demotion, Home rated his performance "excellent." In 1978, the manager of Home's southern region, having earlier praised Taylor's ability to train people and his consistently excellent results, noted that he was "qualified for managing a larger field office." From 1970 through 1978 Taylor's office exceeded the budgeted level of written premiums in every year and turned an underwriting profit every year but one. The overall company performance was not as good. In December, 1978, a new manager of the Southern region raised Taylor's salary while noting: "Mr. Taylor continues to per-

form his duties in a professional manner. Even in the face of a highly adverse rate regulatory climate Mr. Taylor has produced an underwriting pre-tax profit. Recruits and keeps a highly qualified staff."

Notwithstanding this laudatory evaluation, three months later the regional manager gave Taylor the choice of resigning, accepting a demotion to underwriter manager in Atlanta, or seeking work in the company's other regions. This proposition to Taylor was preceded by a widely circulated memorandum disparaging the leadership in Charlotte. The regional manager stated the memorandum was inadvertently circulated, but he gave Taylor no warning that his services in Charlotte were unsatisfactory. Another company official recalled that shortly before Taylor was demoted, the manager remarked: "Mr. Taylor's work has been satisfactory there ... we have no main reasons. We are just not satisfied with him and we are going to remove him." Taylor's replacement in Charlotte was a 38 year old man with lower job appraisals.

Taylor moved to Atlanta as underwriting manager, but his tenure there lasted only from April 1979 to January 1981, when he was again demoted. Within a few months after Taylor began work in Atlanta, the office manager, age 54, was demoted and replaced by a younger man. Soon after his arrival, the new office manager told Taylor that the Atlanta marketing manager, age 57, "was no good and too old." Speaking of Taylor, he added, according to Taylor's testimony, "in my case he said my age, we'll have to find something possibly different for you." The marketing manager was soon demoted and replaced by a younger employee. Taylor's authority and duties were curtailed, and the new office manager hired and fired some of Taylor's subordinates without consulting Taylor.

Taylor's performance was adversely affected by two other events. His wife had to undergo surgery for cancer in Charlotte while he was in Atlanta and his son was killed in an automobile accident. Taylor missed nine days of work, and for a time his distress was apparent while he was at work. On one occasion, he openly cried in his office over his son's death. Several times he was emotionally unable to deal with his subordinate's inquiries.

Nevertheless, Taylor overcame these adversities. His former supervisor observed at trial that "Mr. Taylor was beginning to accomplish exactly what we wanted in the Atlanta office." Another employee characterized Taylor as the "best [underwriting manager] probably we have ever had." Their assessment was corroborated by Taylor's work. During Taylor's only full year as underwriting manager, he produced a profit. In contrast during a span of five years before and after Taylor's tenure, the Atlanta office had an underwriting loss.

In the latter part of 1980, Taylor's superior began looking for a younger man to replace Taylor without advising him of any impending change. Early in January 1981, Taylor was called from his work and told by the regional manager that he was being transferred to a newly created position in the Charlotte office because the Atlanta office manager did not want him. In the meantime, Taylor's replacement was being introduced to the staff. When Taylor returned to his office, he found his belongings in a box outside his office door. In contrast to the reason given Taylor for the transfer, the regional manager testified that Taylor was transferred to Charlotte for "humanitarian reasons, since Mr. Taylor's wife had moved back and since his emotional state was still not good." Taylor's replacement, although much younger, was incapable of filling the position, and in due time he was terminated.

Taylor's new position in Charlotte was a demotion. Moreover, he was given a sales quota which a company official described as a "challenge, but for a man of your caliber, it is not unreasonable." Assignment of the quota concluded with the written proviso that "[f]ailure to meet your goal will result in your performance being considered unsatisfactory, and appropriate action will be taken." Taylor's authority to recruit new accounts was then curtailed in

such a way as to make the quota unattainable. He testified that he had never seen such a goal imposed on anyone during his tenure at Home. His supervisor admitted when testifying that he had never sent a similar memo to any other employee. In June 1981, Taylor filed a complaint with the EEOC charging age discrimination. Subsequently, he was granted a raise and he has remained with the company.

In addition to showing the sequence of events in his own situation, Taylor introduced other evidence to support his claim that Home engaged in a continuing practice of age discrimination. In 1978, a new president of Home set about to change the company. He testified that the following statement attributed to him in an interview published in the *National Underwriter* was generally accurate:

> [T]he industry over the next five years will 'have to become less inbred, it will have to do what the banks did a quarter century ago,' that is, bring in smart young people.

Pressed for amplification, the president testified:

> Now, if you want to imply that that statement means that I discriminated against older people, that is sheer nonsense.
>
> Anyone who is involved in doing what I am doing, trying to change the character of a company in order to cope with the revolution this industry is facing, you have to bring in young people at some point. Older people grow old, they retire. When you hire new people that in a—generally speaking, they are probably usually younger than the people who have been at the company, because you are building for the future.
>
> New entries are also generally younger than the people who are going out.

The proof, however, showed that older employees were not replaced simply because they retired. Under cross-examination, the president admitted:

> Q  Since 1978, what percentage of the senior management of the company has been changed?
>
> A  If you take, say, a dozen people at the top, probably 90 percent.
>
> Q  And have you made those changes?
>
> A  Yes.
>
> Q  What part of that 90 percent occurred through retirement?
>
> A  A few.
>
> Q  Less than 10 percent?
>
> A  No. I think probably—oh—three or four who retired in the natural course of events.
>
> Q  And how many who were let go by you?
>
> A  Most of them.

The president's personnel policies were not confined to Home's national office. They were practiced in the regional and field offices. The company instituted a national advertising program, approved by the president, which emphasized its "fresh team of aggressive young account executives" and characterized Home "as a young, personal company committed to the future." When the president visited the Atlanta office, he asked the assembled staff, "Would you believe we have underwriters in the company who are 55 years of age?" This rhetorical question made no reference to the capabilities of the underwriters. Age, and age alone, was the object of the president's observation.

In the area where Taylor worked, the new regional manager made 100 personnel changes during the period pertinent to this case. The incumbent managers in Atlanta, age 54, in Arkansas, age 57, in Florida, age 59, and Taylor, age 53, in Charlotte, were all demoted. Only once was a manager, age 41, replaced by an older man, age 43, and that was done to promote the younger manager. The average age of employees who were promoted was 37; the average age of demoted employees was 53. The shift from old to young employees did not generate profits, and the company, the re-

gion, and the Charlotte office all suffered underwriting losses after it occurred.[1]

Home's evidence sharply conflicted with Taylor's. The president, the regional manager, and the Atlanta manager testified that age was not considered when personnel changes were made. The regional manager testified that Taylor was removed from the Charlotte office because the office was "flat rather than upbeat," "disorganized," and having a "possible morale problem." The office was said to rank poorly in 1978 and 1979 in the region, and conditions were so bad that they needed "prompt and immediate attention." He testified about deficiencies in service to independent agents and a serious backlog.

The Atlanta manager testified that the tragic death of Taylor's son in March 1980 left Taylor withdrawn and unapproachable. While Taylor described his grief as affecting his work for "a couple of months," the manager testified that he essentially had to take over Taylor's supervisory function for the balance of the year. He denied making any statement about the marketing manager's age and Taylor's age.

Home officials explained, citing examples, that adverse personnel changes affecting older employees were based on their deficiencies and not on age. Company officials at the national, regional, and local levels attributed the underwriting losses, which followed personnel changes, to adverse conditions in the industry generally, unfavorable state regulatory policies, and the necessity to increase reserves.

Resolving this conflicting evidence, the jury answered a special interrogatory in which it found that Home discriminated against Taylor on account of his age by demoting him in 1979. In answer to another interrogatory, it found that the reasons given by Home for this action were a "pre-

text or cover" for its discrimination against Taylor on account of his age. The jury made similar findings in response to interrogatories pertaining to the 1981 demotion from Atlanta back to Charlotte.

■ In deciding Home's motions for a directed verdict, and judgment notwithstanding the verdict, the court was required to view the evidence in the light most favorable to Taylor and to draw all reasonable inferences in his favor. The court could not weigh the evidence or assess the credibility of witnesses. *Abasiekong v. City of Shelby*, 744 F.2d 1055, 1059 (4th Cir.1984); *Old Dominion Stevedoring Corp. v. Polskie Linie Oceaniczne*, 386 F.2d 193, 197 (4th Cir.1967); 9 Wright & Miller, *Federal Practice & Procedure* § 2524 at 543–45 (1971). The requirement that a claimant must prove that he would not have suffered an adverse employment action but for his age raises questions of causation and motive. The inferences a jury draws to determine causation must be reasonably probable. *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 241–42 (4th Cir.1982). Determination of motive is ordinarily a function within the province of the fact finder because so much depends on an assessment of the credibility of the witnesses. A finding of motive should not be set aside by the reviewing court unless the evidence clearly compels rejection. *See Aluminum Co. v. America*, 148 F.2d 416, 433 (2d Cir.1945); Federal Procedure, L.Ed. § 77:266 (1985). Applying these precepts, we conclude that the evidence was sufficient to sustain the jury's findings that Home discriminated against Taylor on account of his age. Taylor introduced direct and circumstantial evidence to prove this factual issue. Acceptance of this proof depended largely on the jury's assessment of the witnesses' credibility. The district

1. In 1978, Home had an underwriting profit of $21 million; in 1979, an underwriting loss of $52 million; 1980, a loss of $135 million; 1981, a loss of $238 million; 1982, a loss of $265 million.

   In 1979, the region's underwriting losses were $3 million; 1980, $11 million; 1981, $31 million; 1982, $64 million.

In Charlotte, where Taylor was replaced early in 1979 by a younger man, the cumulative underwriting losses from 1979 to 1982 were $9 million. This is in contrast to Taylor's management which produced a cumulative underwriting profit, 1970–78, of $5.9 million with a loss in only one year.

court did not err in denying Home's motions.

Home's motion for a new trial permitted the district court to weigh evidence and assess credibility. A court can exercise its discretion to grant a new trial if the verdict, even though supported by enough evidence to defeat the motion for judgment notwithstanding the verdict, is against the weight of the evidence. 11 Wright & Miller, *Federal Practice & Procedure* § 2806 at 43–45 (1973). The district court's ruling will not be reversed unless a clear abuse of discretion appears. *Abasiekong v. City of Shelby*, 744 F.2d 1055, 1059 (4th Cir.1984). After reviewing the record, we conclude that the district court did not abuse its discretion in denying a new trial.

## II

### Emotional Distress

Home also contends that it is entitled to a new trial because the district court committed reversible error by admitting testimony about Taylor's emotional distress resulting from his demotion, his son's death, and his wife's surgery. It also asserts that the court allowed improper cross-examination of its regional manager about emotional distress.

Taylor testified about the distress caused by the occurrence and manner of his demotions, his son's death, and his wife's surgery in Charlotte while he was in Atlanta. Taylor's wife characterized the changes in his demeanor and attitude. Her only reference to her surgery was the following answer to a question about the causes of Taylor's stress:

A In preparation to moving to Atlanta, I went to my regular doctor for a physical, discovered a lump in my right breast, put me in the hospital for a biopsy, and when I woke up the next morning I had no right breast. I'd had a mastectomy.
Q Was that on account of having cancer?
A Yes, it was.

Taylor's counsel cross-examined the regional manager concerning his perception of the suffering caused by demotion, dislocation, and the loss of a child. The court struck a similar question about cancer surgery.

The most graphic description of Taylor's emotional distress came not from Taylor's witnesses but from a former subordinate of Taylor in the Atlanta office who testified for the company. He related that Taylor "handled things rather nicely" before the death of his son. Then Taylor became so distracted that the witness could not work with him. Taylor also improperly criticized the witness's work. His frustration with Taylor was so great that he discussed quitting with the office manager, who responded as follows: "[H]e reminded me of some of the unique circumstances that Mr. Taylor had endured, primarily the passing of his son and some illness to Mrs. Taylor, and he asked me to be patient and to try to deal with it as best I could." Eventually the witness quit, blaming Taylor.

Damages for pain and suffering cannot be recovered in an action for discrimination on account of age. *Walker v. Petit Construction Co.*, 605 F.2d 128, 129–30 (4th Cir.1979). Consequently, evidence of emotional distress ordinarily is irrelevant and should be excluded. In this case, however, Taylor's emotional distress was inextricably linked with the issue of his 1981 demotion from his position as underwriter in the Atlanta office. Taylor admitted his performance was adversely affected by his distress over the prior demotion from the position of office manager in Charlotte, his son's death, and his wife's surgery while he was away from her. But he maintained his distress impaired his work for only a relatively short time. In corroboration, he presented evidence that he produced the only underwriting profit the Atlanta office had over a five-year span. Coworkers testified to his capable performance.

Home, in contrast, introduced evidence that Taylor's distress impaired his work throughout 1980 and that because of his constant distress he was removed as an underwriter and sent back to Charlotte for

"humanitarian reasons." The jury's resolution of this conflicting evidence depended largely on their assessment of the credibility of the witnesses who testified on this issue.

Taylor's emotional distress over his demotion, his wife's surgery, and his son's death was relevant to the question whether he was demoted from his Atlanta position because of age, as he contended, or because of his impaired efficiency due to his distress, as Home contended. The probative value of the relevant evidence was not outweighed by the danger of unfair prejudice to Home. Consequently, the district court did not err by admitting it. *See* Federal Rules of Evidence 401, 402, and 403. Moreover, the district court cautioned the jury that they were not "to attempt to translate mental anguish, if any, into dollars and cents ..." We find no cause for reversal in Home's assignment of error pertaining to Taylor's emotional distress.

## III

### Statute of Limitations

Home contends that no liability can attach to the 1979 demotion because Taylor filed his EEOC complaint more than 180 days after the demotion. It argues that each demotion was a discrete act and that a pattern or practice of age discrimination cannot give rise to a continuing violation theory that would permit recovery of an otherwise time-barred claim. It also asserts that the evidence was insufficient to show a pattern and practice of discrimination during the period covered by Taylor's first and second demotions.

The Act, 29 U.S.C. § 626(d), requires that a charge of age discrimination be filed with the EEOC within 180 days after the alleged unlawful practice occurred. In *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 380–81, 102 S.Ct. 1114, 1125–26, 71 L.Ed.2d 214 (1982), the Court explained how § 812(a) of the Fair Housing Act, 42 U.S.C. § 3612(a), should be applied when a continuing violation of the Housing Act occurs. Section 812(a) requires that a civil action be brought within 180 days after the alleged discriminatory housing practice occurred. The Court said:

> [F]or purposes of § 812(a), a "continuing violation" of the Fair Housing Act should be treated differently from one discrete act of discrimination. Statutes of limitations such as that contained in § 812(a) are intended to keep stale claims out of the courts.... Where the challenged violation is a continuing one, the staleness concern disappears. Petitioners' wooden application of § 812(a), which ignores the continuing nature of the alleged violation, only undermines the broad remedial intent of Congress embodied in the Act.... Like the Court of Appeals, we therefore conclude that where a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within 180 days of the last asserted occurrence of that practice.

■ The principle explained in *Havens Realty* is applicable to an action brought for age discrimination, because the Housing Act's limitation is comparable to the one imposed by the Age Act in 29 U.S.C. § 626(d). A claimant, alleging discrimination on account of age, is entitled to relief from an unlawful practice, although he did not file a charge within 180 days of its first occurrence, if the evidence satisfies the following requirements: the unlawful practice has continued into the limitation period, the claimant has filed a charge alleging the unlawful practice within 180 days of its last occurrence, and the proof sustains the charge. The proof must establish that the unlawful practice is continuing or ongoing and that it currently affects the claimant. *See Kim v. Coppin State College,* 662 F.2d 1055, 1060–61 (4th Cir.1981).

■ In response to interrogatories, the jury found that Home conducted a continuing policy or practice of discrimination against older employees on account of their age from the time of Taylor's first demotion in 1979 until his second demotion in

1981. The jury also found that Home's reasons for this action were a "pretext or cover" for discrimination against older employees on account of their age.

Taylor's 1979 demotion falls within the principle explained in *Havens Realty.* He filed a timely charge based on his 1981 demotion and sustained the charge by adequate proof. He also proved by adequate direct and circumstantial evidence, which we outlined in Part I, to the satisfaction of the jury and the trial judge that Home engaged in a continuing practice of discrimination against older company employees on account of age from the time of his first demotion in 1979 to his second demotion in 1981, which was within the limitations period.

The cases which Home cites do not require reversal. We distinguished *United Air Lines v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), on which Home relies, and applied the principle of a continuing practice of discrimination in *Kim v. Coppin State College,* 662 F.2d 1055, 1060–61 (4th Cir.1981),[2] and *Jenkins v. Home Insurance Co.,* 635 F.2d 310, 311–12 (4th Cir.1980). Other cases on which Home relies, *Woodard v. Lehman,* 717 F.2d 909 (4th Cir.1983), and *Lawson v. Burlington Industries, Inc.,* 683 F.2d 862 (4th Cir. 1982), are also distinguishable. In *Woodard,* the claimant failed to charge any discriminatory practice within the limitation period. Thus, the claimant, unlike Taylor, did not satisfy the requirement of *Havens Realty,* 455 U.S. at 381, 102 S.Ct. at 1125, that an unlawful practice must continue "into the limitations period." *Lawson* held that an illegal layoff does not encompass an allegation of illegal failure to rehire. Unlike Taylor's claims of two similar acts, the claims in *Lawson* were dissimilar.

**2.** In *Kim,* 662 F.2d at 1060–61, we explained: The district court ruled that the "continuing impact" of this alleged discrimination did not defeat the bar of the statute of limitations for college actions taken prior to 1974 ... *Evans,* however, held that a United flight attendant was not entitled to retroactive seniority for a past act of discrimination when she had departed United for an interval. This court, in contrast, has consistently distinguished *Evans* when the discriminatory employment practice has continuously affected the complaining employees and is continuing.

## IV

## Damages

Taylor's salary was not cut when he was demoted. He sought compensation based on what he claimed he would have earned in salary increases, bonuses, and promotions if the company had operated under a neutral policy with regard to age. His expert testified about the average wages of Home's office managers in the region and in the nation. Also as evidence of Taylor's lost compensation, the expert testified about the salary and bonuses received by Taylor's replacement. Taylor also introduced testimony through his expert about the salary and bonuses he would have received had he been promoted to fill a vacancy in the position of regional underwriter at Atlanta, which became vacant the day he was demoted to Charlotte. Taylor showed that he had been considered promotable before his demotion. He and a coworker testified about his qualifications for the Atlanta vacancy. The expert's total of lost compensation was $123,110. The jury awarded $112,000.

Home contends that the back pay determination by the jury was excessive as a matter of law. It argues that the award was based on salary comparisons that were unsupported. It claimed Taylor's salary could not fairly be compared to that of the new Charlotte manager or the employee who ultimately filled the Atlanta vacancy. It offered testimony that the Home compensation system rendered the Charlotte comparison inaccurate, that Taylor never applied for the Atlanta job, and that the vacancy was eventually filled by the man who left it. Home also attacked the expert's salary computation for the Atlanta comparison.

The court instructed the jury on back pay in the following way:

If you reach the question of damages, the amount of damages that is recoverable for a violation of this Act is the economic employment related losses up to the present time. It's the difference between the earnings and the benefits, if any, which the plaintiff would have received had he not been reduced in stature or [demoted]. That's on one side, what the plaintiff would have earned if he had carried on with the normal salary and benefits and expectations of his employment. You compare that, on the other hand, with the earnings and benefits and other advantages of employment which he has received or been able to earn with reasonable effort during the period since the demotion. So, it's the difference between what he would have got, including tenure and promotions and demotions, if any, under the original arrangement and with the original stature if he had carried on, compared with what he has been able to earn in other activities since that time. If you reach this issue, it would be appropriate, for example, to compare with what has happened to other people whom you find to be comparable to his then situation, you can compare his history in the interim with what has happened to other people whom you find to be reasonably comparable to the plaintiff in [their] stature and in capacity and in employment productivity.

The corresponding special interrogatories required the jury to determine, with respect to each demotion, "[w]hat amount, if any, is Howard Taylor entitled to recover [from the time of demotion] to the present day."

The instructions and interrogatories adequately presented the issue to the jury. *See Dreiling v. General Electric Company,* 511 F.2d 768, 774 (5th Cir.1975). The jury could properly, in light of the instructions, assess compensation otherwise available to Taylor but for Home's age discrimination. The jury heard the merits and demerits of the Charlotte and Atlanta comparisons and apparently attached credence to Taylor's proof. We conclude that the damage award rests on sufficient evidence.

■ Home next argues that the court committed reversible error when it resubmitted an interrogatory to the jury. The interrogatories called for separate findings of damage arising from the first demotion to the present and the second demotion to the present. This was a reasonable way to frame the damage issue in case of partial reversal on appeal. Unfortunately, as Taylor's counsel pointed out after the jury retired, the instruction did not make clear that the second damage figure was part of the first, not in addition to the first. Although the court reinstructed on this point, the jury returned a verdict of $112,000 on the first demotion and nothing on the second. The court clarified its instructions. After reconsideration, the jury returned a verdict of $112,000 for the first demotion and $68,000 for the second demotion. The court entered judgment for $112,000, because, as explained in the charge and set forth in the interrogatories, this sum included all damages from the time of the first demotion until "the present day."

Home insists that our holding in *McCollum v. Stahl,* 579 F.2d 869 (4th Cir.1978), controls this case. *McCollum,* in which a jury found no liability but assigned damages, forbade resubmission of a special interrogatory when "there was before the court a decisive verdict, an unequivocal finding of no wrongful conduct by [the defendant]." Resubmission under the circumstances was tantamount "to a direction to find liability in order to warrant the award of damages." 579 F.2d at 871.

The district court's resubmission of the back pay interrogatory differs from the situation presented by *McCollum.* Resubmission did not direct the jury to find liability. Here, the jury had rendered its verdict on liability. Quite reasonably, the district court sought to clarify the damages attributed to each demotion without dictating the result. This was a prudent exercise of discretion to provide adequate findings for the purpose of appeal. Resubmission did

not increase the award. It simply separated its components. *See generally* 9 Wright & Miller, *Federal Practice & Procedure* § 2510.

## V
### Willfulness

■ Section 7(b) of the Act, 29 U.S.C. § 626(b), provides that a prevailing plaintiff is entitled to double damages "only in cases of willful violations." In response to special interrogatories, the jury found that with respect to each demotion that Home's discriminatory actions were willful. Accordingly, the district court entered judgment for double damages.

On the issue of willfulness, the district court instructed the jury:

This is the only issue on which you consider any of the evidence about actions that caused emotional distress to the plaintiff. The plaintiff has the burden here of satisfying you that the defendant discharged him knowingly, deliberately, intentionally, willfully. That means with the intent to deprive or injure. It means doing something that the defendant or its agents knew or should have known would be a violation of the plaintiff's rights under the law and without regard for the harm that might be caused by that action. A willful act is an act which the one that does it realizes is going to hurt somebody else, that it's a violation of the rights of that person and is nevertheless done. It's a deliberate act, unlawful in nature, which causes harm which is foreseeable or obvious and in disregard of the rights of the person against whom that act is taken.

\*    \*    \*    \*    \*    \*

The only issue on which you will consider any of the actions which might have caused mental anguish is the issue of willfulness. You are not to attempt to translate mental anguish, if any, into dollars and cents, but it bears, if at all, only on the willfulness questions ...

Home objected on the ground that evidence of emotional distress is not relevant to the issue of willfulness.

After this case was tried, the Supreme Court in *Transworld Airways, Inc. v. Thurston,* —— U.S. ——, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), held that "a violation of the Act was 'willful' if 'the employer ... either knew or showed reckless disregard for the matter of whether its conduct was prohibited'" by the Act. 105 S.Ct. at 625. Home's objection to the district court's instruction was well taken. Whether the employer's action causes the employee emotional distress is not relevant to the issue of willfulness as defined in *Transworld.* Accordingly, the award of double damages is vacated, and the case is remanded for a new trial on the issue of willfulness in which the district court should give an instruction consistent with *Transworld.*

## VI
### Equitable Relief

In his complaint, Taylor alleged that Home "has discriminated and is continuing to discriminate against Plaintiff because of his age and in violation" of the Act. In his prayer for relief, he sought, among other things, an injunction restraining Home from engaging in unlawful practices and from continuing other unlawful practices against him. He prayed that he "be promoted to such higher position than he now holds as he would have reached absent the illegal discrimination of Defendants, together with appropriate back pay and front pay until Plaintiff reaches his rightful place."

In its decree awarding equitable relief, the court made the following findings of fact:

That age was the principal and determining factor in defendant's decision to demote plaintiff from his position as Charlotte Branch Manager in March, 1979....

That age was the principal and determining factor in defendant's later decision to demote plaintiff from his position as Atlanta Underwriting Manager in January, 1981....

That plaintiff was qualified for promotion to the position of Regional Underwriting Manager in January, 1981, and would have been promoted to this position at the time it became vacant had he not been discriminatorily demoted by defendant.

That after plaintiff's January, 1981, demotion, the position of Regional Underwriting Manager was replaced by the positions of (a) Regional Property Underwriting Manager *and* (b) Regional Casualty Underwriting Manager, and that plaintiff is qualified to fill the position of Regional Casualty Underwriting Manager.

The court awarded, among other provisions, the following equitable relief:

Defendant is directed to offer plaintiff the job of Charlotte Branch Manager and the job of Southern Regional Casualty Underwriting Manager (with relocation expenses), when each next becomes available, and plaintiff may decline or accept the first such offer and in either event await the other offer.

The decree also provided for corresponding front pay, bonuses, benefits, and pension adjustments.

Home assigns error to the decree, particularly with respect to the provisions pertaining to the regional underwriter's position. It argues that the court's findings are clearly erroneous and that Taylor's failure to apply for the position precludes relief.

■■■■■ Whether Taylor was promotable to the regional underwriter's position was litigated at the trial. The evidence discloses that prior to his first demotion, Taylor was rated as promotable to a higher position. He was a competent underwriter. Taylor and the former manager of the Atlanta office testified that he was qualified for the regional underwriter's position. Home introduced conflicting evidence. In fashioning appropriate relief, it was the function of the district court to resolve these conflicts. Its findings are not clearly erroneous, and, consequently, we must accept them. *Anderson v. City of Bessemer,*

— U.S. ——, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Neither party requested that the issue of promotability be submitted to the jury, but, contrary to Home's contention, this omission does not require reversal. In absence of a demand for submission to the jury, the court is authorized by Federal Rule of Civil Procedure 49(a) to make the finding.

Failure to evince an interest in a vacancy has been held to preclude relief for an employee who charges age discrimination. *See Fink v. Western Electric Co.,* 708 F.2d 909 (4th Cir.1983). But *Fink,* on which Home relies, presents quite a different picture. There the company had an elaborate plan for finding vacancies for employees whose jobs were being terminated, and its efforts to assist the plaintiff were rebuffed. Here, in contrast, Home had no structured procedure for its employees to apply for high level vacancies. From the evidence, the jury and the court could reasonably infer that the regional manager filled vacancies by unilateral selection or transfer without soliciting applications. Moreover, as Taylor points out, the court could reasonably infer that his application, even if made, would have been futile in view of the reasons and manner of his summary demotion. In sum, the absence of an application does not render the district court's findings erroneous or preclude as a matter of law the relief it awarded. We conclude that the district court did not abuse its discretion in its award of equitable relief.

## VII

### Cross-Appeal

At the conclusion of the evidence, the district court ruled that the proof failed to sustain Taylor's claim that Home intentionally inflicted emotional distress. Upon review of the evidence, we agree with the district court's conclusion. *See Dickens v. Puryear,* 302 N.C. 437, 276 S.E.2d 325 (1981) (elements of the tort). Accordingly, the district court did not err in directing a verdict for Home.

## VIII

We have considered Home's other assignments of error and find in them no cause for reversal. The district court properly denied Home's pretrial motions for summary judgment because it correctly perceived genuine issues of material fact. The district court did not abuse its discretion in assuming jurisdiction over the pendent state claim for intentional emotional distress inasmuch as Taylor's emotional condition was relevant to both his charge of age discrimination and Home's defense. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The district court did not abuse its discretion in its rulings pertaining to the admission and exclusion of evidence. Home's motion to supplement the record with pretrial depositions is denied for reasons adequately stated by the district court in its order of February 7, 1985. The district court's award of double damages is vacated, and the case is remanded for a new trial on the issue of willfulness under proper instructions. In all other respects, the judgment is affirmed.