**Ned HAIMOVITZ, Plaintiff,**

**v.**

**UNITED STATES DEPARTMENT OF JUSTICE; Edwin Meese, III, U.S. Attorney General; and Allen Nelson, Commissioner of Immigration, Defendants.**

**Civ. A. No. 88–0634.**

United States District Court, W.D. Pennsylvania.

Aug. 23, 1989.

Daniel W. Ernsberger, Pittsburgh, Pa., for plaintiff.

Mary Beth Kotcella, Asst. U.S. Atty., for defendants.

## OPINION

D. BROOKS SMITH, District Judge.

This matter is before us for disposition following a non-jury trial which commenced on August 7, 1989. In accordance with Federal Rule of Civil Procedure 52, we enter the following:

## FINDINGS OF FACT

1. Plaintiff, Ned Haimovitz, who is now sixty-five years of age, was employed as a

General Attorney—Naturalization for the Immigration and Naturalization Service (INS) of the Department of Justice, and was stationed in Pittsburgh, Pennsylvania, a sub-office of the INS' Philadelphia District. (Testimony of Haimovitz).

2. Haimovitz was employed by the INS from September, 1956 to March 16, 1984, when he retired. At all times during his service with the INS, Haimovitz worked out of the Pittsburgh Office. (Testimony of Haimovitz).

3. During Haimovitz' service with the INS, he received three outstanding awards and several letters of commendation. No other INS attorney has received more than three such awards. (Testimony of Haimovitz).

4. Haimovitz' position as a General Attorney–Naturalization entailed reviewing applications for naturalization. This required a written recommendation to the Court for or against that individual applicant's naturalization. This position also required a certain amount of work obtaining citizenship for an individual through the citizenship of his parents or spouse. (Testimony of Haimovitz).

5. The INS is a branch of the Department of Justice. Attorneys working in the INS in 1981 were designated either General Attorney—Naturalization or Trial Attorney. (Testimony of Haimovitz, Exhibit AA).

6. In 1981, General Attorneys—Naturalization were under the direction and supervision of the Assistant Commissioner for Naturalization. Trial Attorneys were under the direction and supervision of the INS' General Counsel. (Testimony of Schmidt, Exhibit AA).

7. In 1981, the Justice Department initiated a consolidation of all INS attorneys. The goals of the consolidation were (1) to place all attorneys under the professional supervision of the General Counsel of INS; and (2) to increase the resources of INS. To achieve these goals, the consolidation was to decrease the amount of time attorneys spent in the naturalization activities. This, in turn, was to create a legal staff that could meet the agency's changing needs. (Testimony of Schmidt, Exhibit A and AA).

8. The consolidation of the INS attorneys created a problem: the General Attorneys who were still working in Naturalization were subject to only minimal supervision by the General Counsel of INS. In addition, the General Attorneys were being paid out of the Commissioner's budget, despite the fact that the Commissioner technically had no supervisory power over them. (Testimony of Schmidt).

9. In an effort to align its supervisory control with budgetary obligations, the Department of Justice initiated a reorganization of the INS attorney positions in mid-1982. (Testimony of Schmidt).

10. The reorganization was intended to eliminate all General Attorney positions. The General Attorneys would not be terminated immediately, however. Instead, the General Attorneys would be placed in a pool and reassigned to available Trial Attorney positions over a two to three year period. The end result of the reorganization was that all INS attorneys would be Trial Attorneys. (Testimony of Schmidt).

11. The reorganization and concomitant elimination of the position of General Attorney was initiated by placing all General Attorneys into a pool. The pool attorneys were then questioned about their wishes to relocate. If a pool attorney was willing to relocate, he was afforded that opportunity. (Testimony of Schmidt).

12. Pool attorneys who did not volunteer for relocation were permitted to continue working in their current position until notified by the General Counsel of a management need transfer. Until notified of a management need transfer, a pool attorney was able to select any of the Trial Attorney vacancies which were continually made available. These vacancies were announced by the General Counsel by way of memoranda sent to each INS office staffed by at least one attorney. (Testimony of Schmidt).

13. In turn, the memoranda regarding job vacancies was made available to the office attorneys. (Testimony of Schmidt).

Job vacancy memoranda were received by the Acting Officer in Charge, Seth Moulthrop, in the Pittsburgh sub-office. Moulthrop then placed these announcements on the board in the front office as part of his routine duties. It was common knowledge that notices, including job vacancies, were posted on the front board. In addition, some of these notices were distributed to both attorneys in the Pittsburgh sub-office, that is Haimovitz and August Landolina. Announcements were never distributed to one attorney and not to the other. (Testimony of Moulthrop).

14. Pursuant to the reorganization, if a Trial Attorney position became available and no one volunteered for it after it had been advertised by way of the job vacancy announcements, the General Counsel's office would select an office where there were pool attorneys to be reassigned. The General Counsel's office would then ask for volunteers from that office with the understanding that one of the attorneys would be reassigned. (Testimony of Schmidt, Exhibit F).

15. If the General Counsel's office had no volunteers for the available trial attorney position from the selected office with pool attorneys, the pool attorneys were permitted to write a memorandum to the General Counsel stating their reasons for not wanting to be reassigned. The General Counsel would then select a pool attorney for reassignment. (Testimony of Schmidt).

16. The General Counsel did not consider a person's eligibility for retirement as a sufficient reason to preclude their reassignment. To do so would have exempted all attorneys who were previously General Attorneys—Naturalization and who were eligible to retire. To exempt retirement age attorneys from the reorganization and relocation program would have frustrated the INS' needs. (Testimony of Schmidt, Exhibit N).

17. These procedures for implementing the attorney reorganization were made known to all the attorneys. One method used by the General Counsel of INS to inform INS attorneys about these procedures was through the presentation of several seminars. In particular, a seminar was held in Boston, Massachusetts, in June 1982 regarding the reorganization. All INS attorneys were encouraged to attend by way of three telex memoranda. (Testimony of Schmidt, Haimovitz and Landolina; Exhibit B, D, E, F).

18. At all times during the consolidation/reorganization up to the time of Haimovitz' retirement, there were only two General Attorneys in the Pittsburgh sub-office, the plaintiff and Landolina. These attorney positions in the Pittsburgh office were eliminated. There have been no full or part-time attorney positions in Pittsburgh since completion of the INS reorganization. (Testimony of Haimovitz, Schmidt).

19. Landolina attended the June 1982 conference regarding the reorganization; Haimovitz did not. Haimovitz was not discouraged from attending the meeting. Instead, Haimovitz chose to obtain the information regarding the reorganization from his co-worker Landolina. (Testimony of Haimovitz, Landolina).

20. Haimovitz understood from Landolina that the reorganization would begin with the larger INS offices and proceed to the smaller offices. As a result Haimovitz concluded that Pittsburgh would not be affected for years. He did know that both positions in Pittsburgh were to be eliminated and that both he and Landolina were designated as pool attorneys. (Testimony of Haimovitz).

21. In January 1984, the INS had a need for a Trial Attorney in Harlingen, Texas. The General Attorneys in the Pittsburgh INS Office were notified of this position on January 24, 1984, by a memorandum from their superior, Richard Sharkey. Neither Haimovitz nor Landolina volunteered for the position. Both understood that regardless of the fact that neither volunteered, one of them would be reassigned. (Testimony of Haimovitz, Landolina).

22. Sharkey's memorandum regarding the Harlingen, Texas, position afforded both Haimovitz and Landolina the opportunity to respond by January 27, 1984. Lan-

dolina and Haimovitz both sent letters to Sharkey reciting their reasons for not wanting to be reassigned. Haimovitz' letter was not written until January 30, 1984, three days after the date by which Sharkey required the letters. (Testimony of Haimovitz, Landolina).

23. Haimovitz' letter explained that he did not want to be reassigned. He cited certain health problems which had occurred in 1977–1978, and stated that if he could remain in Pittsburgh, he would retire at the end of the year. (Testimony of Haimovitz).

24. On February 1, 1984, Dale Page, the Eastern Regional Counsel, notified Moulthrop, the Pittsburgh Acting Officer in Charge, that Haimovitz had been selected for Harlingen, Texas. (Testimony of Mouthrop).

25. Haimovitz then sent a second letter to Paul Schmidt, the Deputy General Counsel, stating that he did not want to go to Harlingen. Haimovitz' letter also urged the General Counsel to reconsider because he claimed a former INS attorney was willing to take the position. (Testimony of Haimovitz, Exhibit N).

26. On February 10, 1984, plaintiff informed his physician of his intent to retire soon. (Exhibit 15).

27. Haimovitz also informed his coworker, Landolina, of his intent to retire at the end of 1984. (Testimony of Landolina).

28. Despite Haimovitz' protests, the General Counsel informed him by letter of February 21, 1984, of his management need transfer to Harlingen. The General Counsel explained why his hardship reasons for non-transfer were not sufficient to preclude his selection. The letter further explained why the Harlingen position could not be filled by the former INS attorney who wanted the position. Specifically, the General Counsel stated that this individual was not within the scope of the reorganization plan, nor was it in the best interests of the service to fill the Harlingen position with this former attorney. (Exhibit N).

29. The General Counsel's letter of February 21, 1984, to Haimovitz also explained that Haimovitz was as qualified for the position as Landolina. Both Haimovitz and Landolina were judged capable of performing the work of the Harlingen position. On that basis, the decision was made that Haimovitz would be the first to be reassigned. (Exhibit N).

30. In fact, both Haimovitz and Landolina had been evaluated by their superior, Sharkey, as above average in performance and approximately equal with regard to qualifications. Both attorneys were adjudged to be capable of adapting to the new position which entailed an administrative practice. Plaintiff, therefore, was competent to perform the job of Trial Attorney in Harlingen, Texas. (Testimony of Schmidt).

31. The decision to reassign Haimovitz to Harlingen, Texas, was made substantially by General Counsel, Maurice Inman, Jr. Inman received a limited amount of input from Schmidt, Page, and Sharkey. Schmidt did not consider the age of attorney personnel in selecting or recommending candidates for management need transfers. (Testimony of Schmidt). Sharkey's input consisted of only an affirmative response to Page's inquiry regarding whether Haimovitz was capable of performing trial attorney work. (Exhibit # 1 to Sharkey depo.).

32. Haimovitz was to notify the General Counsel, within five days from his receipt of the above letter, whether he was accepting the reassignment to Harlingen. The reassignment was to be effective March 18, 1984. (Exhibit N). Haimovitz failed to notify the General Counsel as to whether he accepted the Harlingen position. (Testimony of Schmidt).

33. Haimovitz was contacted by his superior, Sharkey, during the week immediately preceding the effective date of his reassignment, March 18, 1984. Sharkey reiterated that Haimovitz had until Sunday, March 18, 1984, to accept the position. If Haimovitz failed to accept, he would be terminated and risk losing certain benefits. Haimovitz then retired on March 16, 1984. (Testimony of Haimovitz).

34. Immediately prior to Haimovitz' retirement, Sharkey talked to Landolina regarding a *possible* position with the competitive service in the Pittsburgh INS office. Landolina then contacted Lyle Karn, the Philadelphia District Director of the INS to inquire about this position. (Testimony of Landolina).

35. Sharkey only conveyed to Landolina his suspicion that an opening in the Pittsburgh office might occur. Sharkey did not know if an IE job even existed, or if such a job would be in Pittsburgh. Rather, the possibility of an opening was a suggestion to help comfort Landolina whom he considered a friend. Sharkey did not speak with Haimovitz regarding this subject. (Testimony of Sharkey, Landolina, Karn, Exhibit #1 Sharkey Depo.).

36. Mr. Richard Sharkey knew that both Haimovitz and Landolina wished to remain in the City of Pittsburgh. He determined that if Mr. Haimovitz retired, he would suffer little harm and he would still be in Pittsburgh, and if a one-half attorney, one-half examiner slot developed, then Mr. Landolina would also be able to remain in Pittsburgh. In a letter of February 24, 1987, Mr. Sharkey wrote:

"I was concerned about the wishes of both attorneys to remain in Pittsburgh. If Mr. Haimovitz retired, he would suffer little harm, he would still be in Pittsburgh. If the one-half attorney, one-half examiner slot developed, then Mr. Landolina would be able to remain in Pittsburgh. Unfortunately the one-half attorney, one-half examiner slot never panned out."

37. Following Haimovitz' rejection of the Harlingen position and his retirement, Landolina received notification of his reassignment to Harlingen, Texas. Landolina accepted the position because a refusal would have resulted in his termination. Landolina's acceptance was a maneuver to buy himself five weeks more time. (Testimony of Landolina).

38. After his reassignment to Harlingen, Texas, Landolina pursued the possibility of a non-attorney opening in the Pittsburgh office. Due to the increased work-load caused by the elimination of the general attorney positions, Karn applied for authorization to create an immigration examiner (IE) position. The IE position itself was not authorized until some time in March 1984. This IE position was to be under the supervision of the Philadelphia District Director Karn. The IE position was in the competitive service and the Office of Personnel Management (OPM) handled the recruiting for the position. Karn specifically requested that the OPM provide the Pittsburgh General Attorneys with the opportunity to be considered for the IE position. (Testimony of Karn, Cleary, Exhibit S and W).

39. No one initiated contact with Landolina concerning the IE job, nor did anyone tell him to apply for it. Landolina actively sought other employment after being notified of the Harlingen transfer; in addition to expressing to Karn an interest in any vacancy that could become available, Landolina looked to about 35 other jobs in other agencies. (Testimony of Landolina).

40. Landolina then applied for the IE position. Karn anticipated both attorneys would have access to the information regarding the IE position, but he was not aware of Haimovitz' retirement. (Testimony of Karn).

41. Karn did not inform either Haimovitz or Landolina of the IE position. Karn did inform Page, the Regional Counsel, about the IE position after it was authorized. (Testimony of Karn).

42. Haimovitz did not seek employment with any government agencies after retiring. Although Haimovitz could have applied for the IE position, he did not.

43. Landolina's acceptance of the IE position resulted in a reduction of his salary by approximately one third. His base pay was reduced to approximately $33,140 in 1984, $34,290 in 1985 and 1986, $35,326 in 1987, $36,000 in 1988 and $37,510 in 1989. Landolina also received overtime compensation. (Testimony of Landolina).

44. Despite his law degree and a familiarity with immigration law, Haimovitz concluded that he could not practice law.

Rather, Haimovitz started an immigration consulting business for various law firms in Pittsburgh. Although Haimovitz initially lost money, he continued consulting because he enjoyed what he was doing and would have done it "for nothing." (Testimony of Haimovitz).

45. In private practice, Mr. Haimovitz has earned/(lost) the following:

| 1984 | –0– | |
|------|------|------|
| 1985 | ($2,282) | |
| 1986 | ( 2,104) | |
| 1987 | ( 1,404) | |
| 1988 | 347 | |
| 1989 | 2,200 | (half year) |

46. Haimovitz experienced some mild tension as a result of his work environment and reassignment. Haimovitz' symptoms were of the type usually experienced by an employee who is reassigned to a new location and job. (Testimony of Haimovitz).

47. Since Haimovitz understood from Landolina that the attorney reorganization would not affect the Pittsburgh office for another three to four years, Haimovitz planned to work in Pittsburgh until reassigned and then retire unless he could obtain a position within a reasonable distance from his Monroeville, Pennsylvania, residence. (Testimony of Haimovitz).

48. Haimovitz planned to do consulting upon retirement. (Exhibit 15). For this reason, Haimovitz made no other inquiries about work with either the government or private business. (Testimony of Haimovitz).

49. In the event Landolina had first been reassigned to Harlingen, Texas, Haimovitz would have been reassigned to another location within a month's time. (Testimony of Schmidt).

50. Haimovitz had socially talked about retirement with his friends, family, Landolina, and Sharkey. The attorney reorganization and its concomitant elimination of the Pittsburgh attorney positions prompted Sharkey to discuss retirement with Haimovitz on a more frequent basis, that is, on a weekly to bi-weekly basis. Sharkey's conversations were prompted by the knowledge that Haimovitz was planning to retire and because the Pittsburgh attorney positions were to be eliminated. In fact, Sharkey told Haimovitz that he was being "pushed to retire". This statement was Sharkey's view alone and was not made at the direction of Sharkey's superiors, Page, Schmidt or Inman. Sharkey was concerned about both Haimovitz and Landolina and was trying to find a way to keep both in the Pittsburgh area. (Testimony of Sharkey).

51. Haimovitz' work environment was not so intolerable that a reasonable person would have considered it necessary to resign or retire.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this matter pursuant to 29 U.S.C. § 626(c)(1).

2. Haimovitz is a member of the protected group of individuals who are at least 40 years of age. 29 U.S.C. § 631(a).

3. Haimovitz' reassignment to Harlingen, Texas, was not an adverse employment decision.

4. Haimovitz was qualified for the Trial Attorney positions to which reassignments were to be made.

5. Haimovitz failed to prove by a preponderance of the evidence a prima facie case of age discrimination as it pertains to his reassignment to Harlingen, Texas.

6. Haimovitz has failed to establish by a preponderance of the evidence that age was not a neutral factor in the defendant's decision to reassign him to Harlingen, Texas.

7. Defendant's selection of Haimovitz for the Harlingen, Texas, position was a choice between two equally qualified candidates. Defendant has met its burden of production.

8. The plaintiff, therefore, must prove by a fair preponderance of the evidence, that the reason for his reassignment was other than that assigned by his employer, that the assigned reason was only a pretext for discrimination, and that in fact his reassignment was because of intentional age discrimination against him.

9. Plaintiff has failed to establish, and prove beyond a preponderance of the evidence, that defendants' stated reasons for the transfer are a mere pretext or that his reassignment was because of intentional age discrimination.

10. Defendant was not obligated to afford Haimovitz preferential treatment. Therefore, defendant did not have to reassign the younger employee, Landolina, to Harlingen, Texas, before reassigning the older employee, Haimovitz, to that position.

11. Haimovitz was not constructively discharged by the defendant.

12. Haimovitz has failed to establish by a preponderance of the evidence a prima facie case of age discrimination as it pertains to the failure to provide information regarding the immigration examiner position because the defendant did not afford the younger employee more favorable treatment. The immigration examiner (IE) position did not exist at the time Sharkey made the communication to Landolina. Therefore, no one received information specifically about an actual immigration examiner position.

## DISCUSSION

■ This age discrimination claim was tried before the court without a jury.[1] The alleged discrimination arises out of the reorganization of all of the attorneys in the Immigration and Naturalization Service (INS). This reorganization was implemented throughout the country and resulted in the elimination of the position of "General Attorney." Although the General Attorney positions were eliminated nationwide, the incumbents of those positions were to be reassigned to other attorney positions over a period of two to three years. Furthermore, the reassignments were to be throughout the United States, and a General Attorney was not guaranteed to remain in the same geographic location where he was currently based. In short, the INS was attempting to provide employment for all those attorneys whose positions were eliminated, but the INS could not ensure that those attorneys would be reassigned locally.

■ This factual scenario is similar to a reduction in force. This particular reduction in force does not arise out of the context of a demotion or lay-off; rather, it arises out of the elimination of an entire category of positions. Consequently, the usual ADEA standard for a reduction in force is not applicable.[2] For this reason, we have tailored that standard to the case at bar.[3]

■ Hence, the plaintiff in this action must show 1) that he is a member of the protected class; 2) that he was qualified to assume another position at the time of the reassignments; 3) that he was adversely affected; and 4) that the employer has not treated age neutrally, but instead has discriminated based upon it. *Ayala v. Mayfair Molded Products Corp.*, 831 F.2d 1314, 1318–1319 (7th Cir.1987); *see also Fink v. Western Electric Co.*, 708 F.2d 909, 915 (4th Cir.1983). Specifically, the evidence with regard to this third element must show that the employer refused to consider retaining or relocating a plaintiff because of his age. *Ayala, supra, Fink,* supra. Alternatively, in a situation where a reduction in force eliminates positions and an employer assists the employees in locating a job, a plaintiff may satisfy the third element of his case by showing that

---

1. The plaintiff does not have a right to a jury trial against the federal government. *See Lehman v. Nakshian*, 453 U.S. 156, 165–168, 101 S.Ct. 2698, 2704–2705, 69 L.Ed.2d 548 (1981).

2. That standard requires that a plaintiff show that he is "'a member of the protected group and that he was laid off from a job for which he was qualified while others not in the protected group were treated more favorably.'" *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 60 (3rd Cir.1988) (*quoting Massarsky v. General Motors*

*Corp.*, 706 F.2d 111, 118 (3rd Cir.1983). In response to inquiry by the Court during trial, counsel for each side was hesitant to characterize the instant matter as a reduction in force case.

3. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 n. 6, 101 S.Ct. 1089, 1093 n. 6, 67 L.Ed.2d 207 (1981), which recognizes that elements of a prima facie case may vary with differing factual situations.

the employer provided job information to younger employees. *Fink,* 708 F.2d at 918.

■ If the plaintiff is able to establish a prima facie case, the burden shifts to the defendant. This burden requires that defendant produce evidence which will rebut "the legally mandatory inference of discrimination." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 255 n. 10, 101 S.Ct. 1089, 1095 n. 10, 67 L.Ed.2d 207 (1981). The defendant's burden is light and "[i]t is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine,* 450 U.S. at 254–55, 101 S.Ct. at 1094.

■ If the defendant carries its burden of production by presenting "a legitimate reason for the action", *Id.* at 255, 101 S.Ct. at 1095, the presumption of discrimination disappears. In its place remains an inference which may be considered by the finder of fact in determining whether the plaintiff has satisfied its ultimate burden of persuasion, *Id.* at 255 n. 10, 101 S.Ct. at 1095 n. 10, "by a preponderance of the evidence that age was 'a determinative factor' in the employer's decision." *Duffy v. Wheeling Pittsburgh Steel Corp.,* 738 F.2d 1393, 1394 (3rd Cir.1984). The plaintiff may succeed by demonstrating that a discriminatory reason more likely motivated the employer or by showing that the employer's reason is unworthy of credence. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

In the instant case, the plaintiff contends that he has satisfied his ultimate burden of persuasion as it pertains to age discrimination in not just one respect, but two. Plaintiff's first theory pertains to his reassign-

ment to Harlingen, Texas. Plaintiff's second theory relates to the provision of information to his co-worker Landolina regarding the possible opening for a non-attorney position in Pittsburgh, Pennsylvania.

We first address plaintiff's theory that his reassignment was discriminatory.

■ Plaintiff contends that Landolina, the younger of the two Pittsburgh employees subject to transfer to the Harlingen position, was more favorably treated because he was not assigned to such an abysmal destination.[4] Rather, the younger employee remained a pool attorney for a longer period of time and was able to apply for the newly authorized non-attorney position in the Pittsburgh INS office. Plaintiff further submits that defendant failed to proffer a legitimate non-discriminatory reason for choosing the plaintiff over the younger employee and, therefore, judgment should be entered for the plaintiff. In short, plaintiff seeks to establish that as an older worker he was given a job in an undesirable location to force his retirement.[5]

■ While plaintiff's theory may seem plausible at first blush, the prima facie elements in a discrimination case require that plaintiff prove that a transfer to Harlingen is, legally, an adverse employment decision. This requirement flows not only from the case law on this subject, but also from the ADEA itself.

First, the ADEA states:
It shall be unlawful for an employer—
(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate with respect to compensation,

**4.** In his testimony, plaintiff referred to Harlingen as "Alcatraz."

**5.** Plaintiff testified that the defendant was also forcing him to retire because, once transferred, he would have been found incompetent for the Harlingen position by his superiors and eventually fired. This, he contends, is because he lacked training as a trial attorney. At best, this is rank speculation. The plaintiff was found to be capable of performing the duties of the Harlingen position. Moreover, implementation of the INS' reorganization demonstrated that general attorneys were assuming trial attorney posi-

tions at locations throughout the country. It is unlikely that the INS would have found Haimovitz incompetent since at least a third of its work force would also have been incompetent in their newly-assigned positions. Furthermore, plaintiff testified that the regular duties of the trial attorney included appearances before administrative agencies. We take judicial notice of the fact that administrative practice is less formal than courtroom practice, and is therefore a more congenial environment for the attorney whose trial skills are not fully developed.

terms, conditions, or privileges of employment ...

(2) to limit, segregate or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee ...

29 U.S.C. § 623(a)(1) and (2). This statutory language requires that an employee be adversely affected in some manner before a claim of discrimination can be alleged. *Price Waterhouse v. Hopkins,* —— U.S. ——, ——, 109 S.Ct. 1775, 1785, 104 L.Ed.2d 268 (1989) (statutory language of § 703(a)(1) of Title VII is described as focusing attention on the adverse employment decision); *Szymczak v. Jones & Laughlin Steel Corp.,* 614 F.Supp. 532, 534 (W.D.Pa.1985) aff'd 791 F.2d 922 (3rd Cir. 1986).

Second, the case law on the subject of age discrimination consistently addresses factual situations which have adversely affected an employee. The adverse results have occurred in the form of a failure to hire, a failure to promote, a failure to retain, a demotion, a layoff, a discharge, a failure to relocate, a failure to train, and a failure to provide benefits. Each of these examples has an attendant negative result, a deprivation of a position or an opportunity.

In both *Szymczak v. Jones & Laughlin Steel Corp.,* 614 F.Supp. 532 (W.D.Pa.1985) aff'd 791 F.2d 922 (3rd Cir.1986) and *Wehrly v. American Motors Sales Corp.,* 678 F.Supp. 1366 (N.D.Ind.1988), the plaintiffs were each provided a job by the defendant despite an ongoing reduction in force. In *Szymczak,* the defendant's motion for summary judgment was granted because the plaintiff failed to establish a prima facie case. Specifically, the Court in *Szymczak* found that the plaintiff who had been called back to work and assigned to a new department had failed to prove that the defendant's "action was adverse or that the

company intended to discharge him at all." 614 F.Supp. at 534.

Similarly, in *Wehrly, supra,* the court found that the plaintiff who was relocated to another position had failed to prove that the defendant's decision had adversely affected him. The Court reasoned that the plaintiff was provided a job and that

[i]f *termination* during a reduction-in-force, in and of itself, is insufficient to establish a prima facie case of age discrimination, then an *offer of relocation* with the same job title and pay is certainly insufficient to establish a prima facie case of age discrimination.

678 F.Supp. at 1378 (interpreting *Matthews v. Allis–Chalmers,* 769 F.2d 1215 (7th Cir. 1985)).[6]

■■■■■ In the instant case, the plaintiff's evidence fails to establish an adverse employment decision which would demonstrate that the defendant was not treated age-neutrally. Admittedly, the plaintiff is a member of a protected group and is qualified for the positions to which reassignments were to be made. But the fact remains that the plaintiff has not been adversely affected in the employment context. He was offered a job. He was retained and was to be relocated at the cost of the defendant. Like our colleague Judge Weber, "we find it difficult to believe that firms which discriminate on the basis of age would carry out their scheme by offering other jobs to their targets." *Szymczak,* 614 F.Supp. at 534.

Although plaintiff may have concluded that such a relocation would adversely affect his personal life, the ADEA only addresses those business decisions which adversely affect one's employment opportunities. Furthermore, while it may be that Harlingen is not the Garden of Eden, no objective evidence of its undesirability was presented at trial by the plaintiff except for his and Landolino's subjective and conclusory antipathy toward a reassignment

---

**6.** We note the Third Circuit's indirect recognition of the fact that an adverse employment decision is necessary for a Title VII claim. In *Bruno v. W.B. Saunders Co.,* 882 F.2d 760, 766 (3rd Cir.1989) the Court states: "The message of

*Chippolini* [*v. Spencer Gifts, Inc.*] [814 F.2d 893 (3d Cir.1987) ] is not, however, that anyone who suffers an adverse employment decision can win a discrimination suit."

there. For these reasons, we find that the plaintiff has failed to establish by a preponderance of the evidence a prima facie case of age discrimination as it pertains to his selection for the Harlingen position.[7]

 Not only has the plaintiff failed to establish the third element of his prima facie case, but we fail to find that the plaintiff has established that the employer has not treated age as a neutral factor. The plaintiff seeks to prove this element by proffering evidence that he was forced to retire, and through statistics pertaining to the national reorganization.[8] We believe that plaintiff's statistical evidence, which we admitted over objection, requires some discussion.

Plaintiff's statistical evidence is set forth in exhibit 14 which was compiled from documents produced by the defendant. Exhibit 14 lists the offices in the INS' Eastern Region, the employees of each office, the attorneys retained in each office, the attorneys assigned to the pool, the ages of each attorney, and the alleged disposition of pool attorneys.[9] Plaintiff submits that exhibit 14 showed that the defendant used the Harlingen assignment as a tool to force the retirement of the older INS attorneys in the pool. Having carefully studied that evidence, we are unable to find that it is probative of this proposition.

Exhibit 14's usefulness is limited. Each of the Eastern Region's offices except for Pittsburgh had the number of attorney positions reduced. Pittsburgh's positions were totally eliminated. Furthermore, plaintiff's exhibit is incomplete and therefore unreliable. Exhibit 14 contains several question marks and fails to even indicate several pool attorneys in the region. Furthermore, a review of the pool attorneys in the protected group of individuals age forty and over in the Eastern region shows the following: one attorney retired; three of the attorneys voluntarily relocated; four of the attorneys were reassigned to locations other than Harlingen;[10] four of the attorneys were reassigned locally; and four attorneys were assigned to Harlingen, each of whom then retired. Further scrutiny, however, shows exhibit 14 to be inaccurate with regard to the four attorneys reassigned to Harlingen.

The inaccuracies of exhibit 14 relate to the number of attorneys reassigned locally. Significantly, two of the four became immigration examiners, a position to which the INS cannot assign an attorney. Rather, to attain an IE post the attorney must take the initiative to apply to the local office for this non-attorney position. Moreover, the plaintiff's compilation omits the fact that there is yet another attorney who was able to obtain a position locally. This was Marvin Stang, a 72-year old man in the New York office, who accepted an immigration examiner position after initially being assigned to Harlingen. Notably, Stang was the oldest employee with the INS' Eastern region and was one of the last attorneys to be reassigned in the Eastern Region.

Since Stang cannot be included as a reassignment to Harlingen, the evidence shows that there were only three attorneys assigned to Harlingen. Once the plaintiff refused the reassignment, it was given to his co-worker, consistent with the INS reorganization procedures. Subsequently, Landolina was able to retain another position.

---

7. To the extent that the plaintiff's theory regarding his selection for the Harlingen position may approach a claim of constructive discharge, we find that the plaintiff has failed to establish such a claim by a preponderance of the evidence. The conditions of plaintiff's employment fell far short of being "so intolerable that a reasonable person subject to them would resign." *Goss v. Exxon Office Systems, Co.,* 747 F.2d 885, 888 (3rd Cir.1984). As noted supra, plaintiff introduced no evidence other than his and Landolina's opinions that Harlingen was, subjectively, an undesirable post.

8. Statistical evidence may be used in an individual disparate treatment case to demonstrate discrimination. *See Bruno v. W.B. Saunders Co.,* 882 F.2d 760 (3rd Cir.1989).

9. Exhibit 14 also addresses the other three regions of the INS. We limit our discussion to the Eastern Region which includes plaintiff's office. Plaintiff's testimony concerning the exhibit related primarily to the Eastern Region.

10. These locations were to Houston, Texas, San Antonio, Texas, Chicago, Illinois, and Los Angeles, California.

The Harlingen position was then offered to the overstaffed New York office which consisted of mostly older attorneys. The first attorney who was reassigned retired, and then the offer was made to another attorney.

Of further significance is the fact that plaintiff designates many of the pool attorneys as "reassigned locally." We find this term to be ambiguous and of little assistance in determining if there was discrimination. The evidence showed that the non-attorney positions in the INS office were in the competitive service. Therefore, the General Counsel could not reassign the attorneys to these positions. Consequently, we find this designation of little weight. *Compare Dale v. Chicago Tribune Co.*, 797 F.2d 458, 465 (7th Cir.1986).

To the extent that Exhibit 14 is relevant, it does not preponderate in favor of plaintiff's contention that age discrimination was agency-wide during implementation of the reorganization. Accordingly, his theory that the Harlingen reassignment was a subterfuge for age discrimination must be rejected.

 Plaintiff also contends that he was being forced to retire. He testified that his superior, Sharkey, told him he was being "pushed" to retire, and that he was continually asked about his plans for retirement. Although this evidence is susceptible to an inference that the INS wanted some of its employees to retire, the testimony showed that once an attorney was in the pool, his eligibility for retirement did not affect his ability to be relocated. In fact, plaintiff was relocated despite his eligibility for retirement. Moreover, the testimony showed that the plaintiff had talked to Landolina and his family about retirement and that the subject was one of general interest among the government employees.

 The defendant, in this case, has proffered sufficient evidence to raise a genuine issue of material fact and to thereby meet its burden of production. The defendant has articulated a legitimate reason for the plaintiff's selection for Harlingen. First, plaintiff's position, as well as his co-worker's position, was eliminated.

Plaintiff's reassignment, therefore, was due to the attorney reorganization. The defendant's agents testified that a trial attorney was needed in Harlingen to meet the increasing demands of the INS in a southern border state. The plaintiff and Landolina were both pool attorneys in the Pittsburgh office and were equally qualified. Hence, the INS selected one of them.

 Plaintiff contends, however, that the INS' explanation that it simply picked one is insufficient as a legitimate non-discriminatory reason. Plaintiff submits that in the absence of an explanation for plaintiff's selection, the plaintiff has discriminated by assigning the plaintiff rather than his younger co-worker. Plaintiff, in essence, argues that since both he and Landolina considered Harlingen an undesirable transfer, the younger employee should have been assigned first in the absence of a more thorough explanation. In other words, older employees should have been given preferential treatment, and the plaintiff is entitled to a directed verdict.

We disagree that older employees should be given preferential treatment. *Burdine* states:

> Title VII does not obligate an employer to accord this preference. Rather, the employer has discretion to choose among equally qualified candidates, provided the decision is not based on unlawful criteria.

450 U.S. at 259, 101 S.Ct. at 1097. Therefore, *Burdine* teaches that in the absence of a preponderance of evidence that age is a determinative factor, an employer who is forced to choose between equally qualified candidates cannot be liable for age discrimination. *See also Wilson v. Sealtest Foods Division of Kraftco. Corp.*, 501 F.2d 84, 86 (5th Cir.1974).

 We also note that the disparity of ages in this action does not compel a finding that age was a factor in the defendant's selection of the plaintiff for Harlingen. Both plaintiff and Landolina are in the protected group, plaintiff being 60 and Landolina being 47. As *Maxfield v. Sinclair Intern.*, 766 F.2d 788 (3rd Cir.1985) teaches, this can give rise to an inference.

But a permissible inference is not a presumption and it does not *ipso facto* constitute proof by a preponderance of the evidence.

In summary then, we conclude that the plaintiff has failed to establish a prima facie case on his first theory of recovery because: a) his transfer to Harlingen does not constitute an adverse employment decision; and b) there is no evidence showing that the employer did not treat age as a neutral factor. Even were we able to stretch the plaintiff's showing on this theory into a prima facie case, the defendant's rebuttal satisfies us by a preponderance of the evidence that no age discrimination in fact occurred.

We turn now to plaintiff's second theory of liability, the defendant's failure to provide Haimovitz with the information about the non-attorney position in Pittsburgh. When an employer assumes the duty of providing its employees with job information during a reduction in force, liability may attach in some circumstances if the employer provides less assistance to the older employees. *Fink*, 708 F.2d at 918.

The employer in *Fink, supra,* was not liable for age discrimination because of the manner in which the job information was supplied to its employees who would lose their jobs. The information which the employer provided concerned actual job vacancies in its own operations, as well as in unrelated corporations. The court found that the employer had provided job information to all employees on an equal basis. Furthermore, the court reasoned that the information relating to other entities in which the employer had no control over hiring decisions was irrelevant. *Fink*, 708 F.2d at 918. Significantly, the plaintiff's claim centered on the position over which the employer had no hiring authority.

The court in *Fink* went on to conclude that the "record leads to one inescapable conclusion: The plaintiff was responsible for his own failure to secure a job." *Id.* at 919. The plaintiff was uninterested in pursuing a job, he thought the job would last for four more years and preferred to take his chances, and he knew of the deteriorating job situation. In light of these facts, the court held that "[s]imply because his gamble went awry provides no basis in fact or law for a finding that the plaintiff failed to get a job 'but for' his age and, more pertinently because of any bias or inaction on the part of the defendant." *Id.* The circuit court then reversed and vacated the judgment for the plaintiff and remanded the cause to the district court to enter judgment for the defendant.

In the matter before us, the defendant provided information about jobs to all pool attorneys on an even-handed basis in the form of written memoranda announcing *actual* job vacancies in which the defendant had the necessary authority to make appointment decisions. These were distributed to each INS office with pool attorneys. In turn, the officers in charge would follow the custom of that office in posting and distributing the memoranda.

Consequently, we are unable to find any taint of age discrimination in the defendant's undertaking to provide its pool attorneys with job information. We are mindful of the fact that the plaintiff's case hinges on Sharkey's contact with Landolina about a possible opening. We do not find this communication attributable to the defendant. The components of this communication are not analogous to the defendant's memoranda in any respect. The communication was purely speculative on Sharkey's part and concerned a position which did not exist. The defendant's memoranda, on the other hand, concerned actual job vacancies. Moreover, the information provided by Sharkey failed to even refer to the immigration examiner position which Landolina eventually obtained. Instead, Sharkey's communication pertained to a half immigration examiner, half attorney position which was never authorized for the Pittsburgh office. In addition, the communication by Sharkey pertained to a position, which if it existed, would not have been subject to the control of the defendant. It was, instead, a competitive service job. The defendant's memoranda, by contrast, always referenced positions over which the defendant had the authority to appoint the individual. As in *Fink*, 708 F.2d at 918, Sharkey's communication is irrelevant.

Second, we do not find that this single instance is sufficient to establish by a preponderance of the evidence that the defendant's efforts to assist its employees affected by the reorganization was compelled by considerations of age. We have found the communication to have been a suggestion made to a friend who was distressed, a friend who actively canvassed numerous government agencies in the Pittsburgh area for a position. Moreover, the communication did not provide Landolina with any new information. Both plaintiff and Landolina knew that the work they had performed would eventually be performed by an individual in a non-attorney position in Pittsburgh. Furthermore, both plaintiff and Landolina knew where to look for job announcements in the Pittsburgh office. In short, Sharkey's communication did not provide Landolina with information regarding an actual job vacancy. Nor did it provide Landolina with information that was not equally available to Haimovitz. Therefore, both plaintiff and Landolina received substantially the same information. Landolina as the younger attorney did not receive more favorable treatment.

Plaintiff's case of age discrimination based on the communication between Sharkey and Landolina, although established prima facie, has not been established by a preponderance of the evidence. An appropriate order will be entered.